May it please the court. The trade court in the proceedings below abused its discretion in two important ways. First, it abused its discretion when it consolidated the hearing on the preliminary injunction motion filed by Oman Fasteners with a trial on the merits. Second, it abused its discretion by finding that Oman Fasteners had satisfied the very high standard to obtain the drastic and extraordinary relief of injunctive relief. I think before we go into either of those two points, I need you to focus on standing for me. Certainly. We would submit that we unquestionably have standing, Article 3 standing, to appear before this court in this appeal. Standing may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. That's, while large, at least seldom, mid-continent, our client has the statutory right to seek redress from unfair trade practices through the trade laws. We are the intended beneficiary, or one of the intended beneficiaries, of the remedial effects of anti-dumping and countervailing due to laws that are included in the Tariff Act. Our intervention at the trade court below is premised on three different statutory provisions as a matter of right. 28 U.S.C. 2631J, 19 U.S.C. 1516A.F.3, and 19 U.S.C. 16779C. I guess my question is that gives you an intervener right to become enmeshed in the decision below, but how does that create a right to standing on appeal? Well, I mean, I would say to the Supreme Court Stringfellow case where the court held that an intervener normally has the right to appeal an adverse final judgment by a trial court. Yes, but this judgment wasn't directly adverse to you. It was inferentially adverse to you. You think it had third-party impact on you, but the judgment here was an injunction involving the government. Your client wasn't actually impacted by the decision from a legal standpoint that would give it a right to appeal. It was impacted inferentially or tangentially or factually because, you know, once the injunction went into place, they could resume importing, and, you know, once the injunction, whatever, what happened below, they could resume importing after that, and that put your client at a competitive disadvantage. But the injunction had nothing to do with your client directly as a beneficiary of the injunction. No, but I think there is injury, in fact, by virtue of the distortions to the marketplace resulting from the change in the- So my problem with that concept is that extends to all competitors. Injury, in fact, right? So here's the deal. You're in a two-party market, and they get penalized for some major EPA violation. And if they don't have to pay that- if they have to pay that penalty, it's going to cause them to drive their prices way up, and you're going to be at a much more competitive advantage. If they don't have to pay that penalty, you're at a disadvantage because they can lower their prices. My concern with what you just said is that it opens this ginormous standing loophole for anyone that can say, I'm a competitor, and if the government goes after them for something, that's to my benefit. In response, Your Honor, I would cite to this Court's decision in the Canadian Trade Lumber Alliance case where under- this had to do with distributions under the Continued Subsidy and Offset Act. In that case, the Court found that the Canadian Lumber Trade Alliance had a standing- Where did they get the money? Sorry? This is the Byrd Amendment? Yes, sir. Where did they actually get the money? Yeah, the domestic industry was given the money. In this case, Montfasten was relieved from having to make- Right, but you don't get the money. Not in this case, not directly. Right. Yeah. But in that case- But that's why they were standing. In that case, they were directly impacted by the actual decision in terms of money changing hands. Well, and I would say we're directly impacted by the actual decision of the trade- No, you're impacted in the competitive market ultimately by their competition, but you're not impacted by the injunction itself. Not technically. That injunction enjoined the Commerce Department from assigning the lawfully assigned adverse rate of 154%. Am I remembering the facts right? That from late December, whenever Commerce imposed this cash deposit until the mid-February injunction, Oman basically stopped importing? They did not stop importing. They did not? Well, they said they were going to, if I remember correctly, but I don't think they stopped. And then when the injunction was imposed, they continued to import. If you look at the official import data, and Oman Fasteners is by far the biggest, maybe their single only nail producer in Oman, you see continued significant imports in the period of time in which that, in our view, artificially low cash deposit rate was in effect. That remained in effect- No, no, I'm actually asking about the two-month period when the artificially high, if one wants to call it, cash deposit rate was in effect. I thought it was clear. I thought they essentially stopped importing, or at least dramatically reduced- No, that is correct. Oh, okay. So again, this would be what is known as a friendly question. That's why it's clear that though it requires an additional step, you suffered injury in fact from the injunction because suddenly all these imports were coming in before the imports were not coming in. Yeah, that's correct. Okay, so is injury in fact, and I'm going to put aside causation and repressibility, which I think are clear, is that the end of the jurisdictional requirement of standing as opposed to ... The word standing sometimes applies to sometimes called statutory standing, though less often because it's confusing. Jurisdictional stuff we have no choice but to demand.  We do have some sort of choice about non-jurisdictional, who has an interest kind of issues that sometimes go by the name of standing. It is very clear, and as we discussed in our reply brief, that this court has jurisdiction unquestionably in this case. We would cite to the Wind Tower Trade Coalition case where we say that dispenses with any challenge to the court's jurisdiction, and I'll read a brief quote from that case. Sections 1292A, 1292C1, and 1295 in conjunction confer jurisdiction upon this court over appeals of interlocutory orders issued by the CIT, granting, modifying, refusing, or dissolving injunctions. And this would be an injunction against somebody other than the appellant? I don't think so. It doesn't, right? Obviously, we have statutory jurisdiction if a case is brought to us challenging a interlocutory order that would be appealable under 1292 in the regional courts of appeals. The statute actually says that, but that doesn't answer the question of whether you're a proper party to bring that. The question, and what I'm trying to focus on is whether on the assumption that you do have injury in fact, those, the usual trio of Article III requirements, but sometimes there's a little bit of an addition of a legally protected interest that's sometimes put into the Article III formulation. I don't know, and that's where I think the kind of concern that the Chief Judge was raising sort of fits. Well, I'd say that Mid-Continent has a legally protected interest here by virtue of its standing as an interested party to seek redress under the trade laws, and the fact that the trial courts actually... Maybe that might not be true in the kind of EPA penalty situation that the Chief was bringing up as an analogy for how to think about whether this kind of bystander is entitled to complain about lack of insufficient government harm to its competitor. Yeah, that would be different because we have sort of a statutory right, if you will, to seek redress and to petition the government for redress from unfair trade practices, and in fact, Mid-Continent as the petitioner has litigated this case since 2014, as well as other cases like it, in order to offset the injurious impact, and when I say injurious impact, that was specifically found by the International Trade Commission of these unfairly traded imports. There's one other kind of pre-merits issue that's been raised here, the mootness question. Do I understand your position to be that even though on a going forward basis, imports are subject now to a new quite low cash deposit, maybe even zero, but anyway, something very small, that doesn't make your challenge to this injunction moot because for purposes of mootness, we consider whether you, we assume you'll win on your challenge, and then there's a possibility, unlitigated yet, that the trial court might require retrospective cash deposits to put Oman in the position it would have been in had the, again by assumption, incorrect injunction never been issued, and that money might actually make a difference for the periods covered that are not yet subject to a final, no longer appealable determination of the proper duty rate. As a matter of, you're correct, I mean, this case is not moot, and because it's a matter of timing, the low, artificially low cash deposit rate that was, commerce was ordered to impose, that covered entries that came in until December 11 of 2023 when the next review was finished and reset the rate. That period of time from say mid-February to December 11, entries came in that are covered by both the 8th review and the 9th review. Both of those reviews are still underway. The 8th review just went to its preliminary determination in August, and the 9th review only just began, and if you look at the, again, the official public import data, you can see that the volumes and values of nails from Oman are very substantial, and our position would be that as a matter of its own regulatory requirements, were the injunction to be dissolved and the cash deposit rate reinstated, commerce would have to order the collection of the additional duty amounts in order to be consistent with its own regulation. But for purposes of mootness, we don't have to agree with you on that. We just have to think that that is an issue that is open to you to argue before the CIT. Yes, I wish you would agree with me about that. Can I get you to move on now, if you don't mind, because we're already in rebuttal time, and I want you to have a choice to address, and what I want you to move to is the injunction, the merits of the injunction. Skip over your argument about consolidation, please, and just go to the merits of the injunction. Certainly, Your Honor. Briefly, we think that the court, the trade court abuses discretion in finding that Oman fasteners satisfy the requirements of all of the four prongs. I'll start with the public interest prong, because that goes right to the underlying merits. There, the trade court summarily found that because it had found for Oman fasteners on the merits, the government had no legitimate interest in collecting the cash deposits at the adverse facts available rate. As we discussed in detail in our brief, that merits analysis, we feel, is fundamentally and deeply flawed. It ignores... And if we thought it was not flawed at all, or at least not flawed in a way that would change the remedy, that would put a big hole in your argument, right? It would put a hole in my argument, but there are four requirements, there are four prongs of the test, and Oman fasteners is required to satisfy all four, not just one, and with respect... Would you like me to move to the other factors, Your Honor? No?  Okay, so let me just say on the public interest and with respect to the merits. The record below is more clear than I've ever seen about the reasons why this filing deadline was missed. Oman fasteners had received extensive time, more than doubling the amount of time it had to complete the filing. Okay, but which factor are you saying that this goes to? What you're discussing now is sort of the good faith basis for being late. Which factor do you think this goes to in the end? That goes to the public interest factor, which the trade court said was satisfied because it had found for Oman fasteners on the merits. So we have to discuss the merits in order to address that factor. I thought you asked me if you could go to other factors. I was asking if you wanted to. Did you? Okay, I will. Whatever you want to say. I was just trying to locate myself. My apologies. It's all right. But on that factor, let me just say that the deadline was unquestionably missed, but more importantly, Oman fasteners counsel sat on their hands for over five weeks ignoring that and hoping commerce wouldn't notice, but commerce did. That's at the heart of commerce's determination. There was no abuse of discretion. Consistent with this court's holding in Dong Tai Peak, what commerce did was entirely appropriate as a matter of law as well as on the facts of this case. Moving on to irreparable harm, our position is that the record shows that Oman fasteners claims of irreparable harm are entirely speculative. If you read the record carefully, it shows that the things they complain about either hadn't yet happened or their claims were undermined by information evidence that we put on the record that the trial court never considered or addressed. So that's clear legal error for not having addressed or considered. Okay, we're way past your time. Is there anything important that you need to address before you sit down? Let me just say briefly on the adequate remedies of law, we think it is clear that there are adequate remedies of law here. Not against the government, right? No, but they don't need to be against the government. If you look at the way eBay Factor is described, it doesn't say adequate remedies of law against the government. Do you have any case, I mean this injunction business and adequate remedies of law comes up I'm sure actually literally every single day in federal courts. Do you have any case law that says an adequate remedy of law can be an opportunity to recover money against some non-party? Well I would say that- For the same injury? As I stand here today, your honor, I don't have anything available to cite to you. That would be a little bit useful, right, on this point. That's the only issue on this point. Okay. All right. And with that understanding that I'm probably out of time, I will sit down. Yep. Sounds great. Okay, Mr. Houston. Is it Houston or Houston? It's pronounced Houston like the city, your honor. Got it. Not Houston like the city. Whatever. It's like the more well-known city in Texas. May it please the court, I'm Michael Houston of Perkins Coulee on behalf of my pastors. This case comes to this court in a very unusual procedural posture. This is an appeal of an injunction, but the government is not here. The government has informed this court that it both will not appeal the preliminary injunction that was entered, it also will not appeal or challenge the final judgment that was entered upon remand. I thought it was a tiny bit equivocal about that second thing, that its language was more we have no plans to appear. So that's fair enough, your honor. My understanding of the government's intentions is that it does not intend to participate. I suppose the government could change its mind, but I think the government has said it doesn't. If we were to find ourselves able to get to the merits here and conclude that the injunction was proper, would that resolve indirectly the state appeal of the final, final judgment? So it would certainly bear on it, your honor, in the sense that I think the court would be making a legal conclusion about the validity of the ultimate order, and that would I think bear on the ultimate determination. In this posture, the court is opining on the legality of the trade court's decision. I think it would certainly have strong, what I'm trying to say is I think it would go a long way. I think potentially there would be other factors. In the final appeal, the appeal from the final judgment, that's been stayed, right? It has by this court, your honor. Do you dispute that Mid-Continent can there argue that the district court's determination in the injunction proceeding about the impropriety of the imposition of a 154 rate, it can do that even though the government is no longer disputing that? We haven't briefed that issue, your honor. Isn't that something that happens, I don't know, on a regular, maybe not frequent basis where the government says, oh, that's all right, we're not going to fight the ruling number two, we're here on the final judgment, we're perfectly happy. And we allow the full party intervener to say that earlier decision was wrong. The government's no longer complaining about it, but it was wrong. And the consequence is that the final decision in front of us is, you know, should never have been entered. So I think your honor is almost completely right if I might suggest I think the one thing that makes it a little more complicated, it's the fact that some prongs of this legal determination are ultimately discretionary with commerce. For example, the Commerce Department has discretion. With commerce. With commerce. The Commerce Department has discretion if the court concludes contrary to the trade court's determination that commerce has discretion to impose an adverse inference, commerce is not required to do so. I think that complicates the analysis, in fairness. I think that's what makes the case potentially different from the mine run of situations that your honor describes. But obviously, the case for midcontinent standing in the state appeal is quite stronger. What's so striking about this appeal is that we're here on a preliminary injunction So why shouldn't the standing question have the same answer to the, you know, in the final judgment in this case? The only difference is the remedial tool that's being used. It has the same effect. I mean, I guess, I mean, right? For two months when you were not importing, they were obviously benefited, and they were The whole reason for the existence of this anti-dumping duty, it's a protective regime, right? To protect domestic industry. So why the difference just because the remedy here is running against the government as opposed to, I mean, the remedy also in the other one goes against, you know, the money's only collected by the government. So again, your honor, first of all, I think it's just a matter of precedent. I want to go directly to your question, sort of the logical implications of it. But we haven't found precedent for the idea of, you know, a preliminary, an injunction entered against the government that the government's not appealing, that an intervener has been allowed to appeal. And I think, obviously, the Penda case, the Brooklyn brewery case that are cited in our brief hold exactly the opposite. Let me address your question directly. You know, why does it make sense? I'm sorry, and those cases involve parties to the case or kind of interlopers? They're about interveners who were not permitted, different, not in the trade court context specifically, but they're about interveners to a proceeding who were not permitted to defend a judgment on an injunction on appeal where the government wasn't. Why does it make sense? Why would it be different in this context? The answer is, I think it's important to remember that we are talking about an injunction affecting estimated duty deposits. The point of the estimate is to make a fair approximation of what the ultimate duties are going to be. We know what the ultimate duties are going to be. They're going to be zero. How do we know that? Because, you know, time has gone on. Commerce has continued to do its work. It's put out the preliminary results of the Eighth Review. But we didn't know that then, right? I'm sorry, when? We didn't know that then at the time of, I forget when the notice of appeal was filed, but the zero percent on remand was until April, right? And this injunction was mid-February. So... That's right. But of course, the Mid-Continent, as the party appealing, has to demonstrate standing at every stage of the case. So I think, you know, maybe that would... But in terms of judging the standing, we have to assume that Mid-Continent is correct on the merits. So I'm going to assume that 154 was the correct rate, correct under the regime, right, which is mostly about accuracy, but maybe not 100 percent about accuracy. I don't want to quibble, Your Honor, but I think, you know, it's... Which I want to say, which is why you have a very strong case on the merits. But for standing, we have to assume that they're right on the merits. Understood, Your Honor. I'm happy to assume it for purposes of this inquiry. It's an estimate. We know now what the actual rate is. Commerce has told us, and that, by the way, that determination... Are you now pivoting to mootness, just so I know, or are you still on standing? No, Your Honor, I'm talking about standing. Okay. The point is... There are two different zeroes, right? The zero is the later cash deposit in an administrative review.  This zero is for this administrative review on remit. Yes, that's exactly right. But the consequences of it being both is what I... That both of those numbers are zero is what I think demonstrates that, you know, there's not going to be a estimate for something that the final has already been answered. That wouldn't make any sense. Now, this is sort of Midcontinent's belated attempt in this court to save its case from mootness. Now, you know, to talk about that, what Midcontinent's position to this court, actually its request for relief of expedited briefing from this court was premised on its observation, correctly, that the case for the preliminary injunction was going to become moot when the next review came out. Then the next review came out, and all of a sudden Midcontinent said, we've changed our mind. We no longer believe that the case is moot. But they couldn't cite anything. And my friend couldn't stand up here and give you any citation for the proposition that the trade court would have the ability to enter a retroactive collection of estimated deposits notwithstanding commerce's subsequent determinations. The law on this... So one of the things I think I said to Mr. Gordon is I was thinking about that, am thinking about that in the category of standing cases where the fact that there are yet to be litigated issues that have to be litigated for the plaintiff or appellant here to end up getting relief doesn't mean that there is no standing to resolve a threshold issue so that if one thinks about this in that framework, the question of whether there could be a retroactive collection, a duty to collect, is something to be litigated. But as long as there is not zero chance that that will occur, then there might be some relief. I completely understand that point, Judge Toronto, and if I could just address it directly for a minute. I think that before the court exercises jurisdiction in the face of a, let's call it a presumptively moot case. I think we've sort of carried our... One way to think about it is we've carried our prima facie burden to show that the preliminary injunction is moot. And then you're looking, is there anything that could save and that could preserve this court's Article III jurisdiction? My respectful submission would be before you exercise that Article III jurisdiction, Midcontinent has got to come up with something. They've got to offer you a case citation or a statute or a regulation or something that would lead you to believe that that remedy that is being hypothesized as the basis for the court continuing to decide the merits of the case actually has a basis in law. And I don't think it suffices respectfully to just say, we'd like to go make an argument that no court has ever embraced so far as we can tell and invent a new concept of estimated duty deposits. And it's on that slim possibility that relief could be entered for the first time ever in that category that this court is going to exercise jurisdiction. I want to spend just a couple moments, if I might, you know, addressing the merits. Because I think that, you know, the trade court had really a trial in this case. It found that this was not a close case. It found that the government had committed multiple errors of law and that we prevailed on four independently sufficient grounds. I do not think Midcontinent has come close to showing that the trade court used as a humanitarian platform. The four grounds are one is the statement in the preamble. A second is a practice of giving a sort of first-time lawyer problem a pass. The third is this is just not even in the ballpark of accuracy under the adverse inference statute. Which one am I missing? I think you gave one, two, and four. The third one is that at the moment when Commerce decides whether to apply an adverse inference at all, before we get to the final step, which is was the actual adverse rate that they selected, the 154%, was that even in the ballpark? It clearly wasn't. But at the third step, Commerce has to make a determination about the actual conduct, the problems that led here. And as this Court said in Nip and Steal, Commerce needs to explain, to reflect an awareness that mistakes sometimes occur. The statute does not demand perfection. Mr. Chisholm, what was the argument that Commerce made below in defending this? I would urge the Court to take a look at the trade court's opinion on this point, Your Honor, because I think what the trade court found, why it found that this was not a close case, is that Commerce's analysis on that point was entirely conclusory. They don't give any explanation at all. They just say, we are going to apply an adverse inference because we find, they just sort of recite the statutory standard. They don't say, well, in the trade court on this, did Commerce kind of put its tail between its legs, or did it really vigorously argue? So, Your Honor, respectfully, putting the tail between its legs is how I would put it, having sat through that trial. I think the government was, let's call it sheepish in its defense of its actions here. And that's because the opinion, of course, that Commerce put out on this point is really pretty bare bones. To say nothing of the final factor that I think Judge Taranto was mentioning, which is, even if you get all the way to the end and you conclude that, okay, we need to have some sanction here. We made a mistake, Owen Fassner's made a mistake, Commerce says, we're going to exercise our discretion to impose some kind of punishment. The rates that had been imposed on this company throughout had been like 0, 0, 0, 1.65. In the face of that record, to say they could have, and they knew, actually based on the actual data, that the right answer was 0. An appropriate exercise of discretion might have been to say, instead of 0, which is the true rate, we're going to impose 1.65, or we're going to double 1.65 to sort of teach you a lesson. That's an agency exercising its discretion. Let me ask one question. What, I mean, you know, I'm sympathetic. You missed the deadline by 16 minutes. It wasn't an access problem. It was user error. Why didn't you bring it to Commerce's attention? Why did you wait five weeks? You know, I'm one of these people that really thinks the best defense, or best offense is good defense. Why did you not, mea culpa? Commerce absolutely had a policy in place of allowing extensions until the next day when people asked for them. So why did you sit back and pretend you weren't late and wait to get your hand caught in the cookie jar? Why didn't you just ask for the cookie? Chief Judge Moore, I think two points about that. The first is that the policy that Your Honor referenced about if you call at the, you know, 4.50 p.m. and we can't get you to get the automatic extension, the bar didn't know about that practice. I think this is discussed in the trade court's opinion. That was sort of unearthed in the Selleck-Hallott case after the events here. So we know that now. And of course that's what we would do today. And what we... And that explains up until 5 o'clock. What explains the next five weeks? Sure. Sure. So I think what explains it is it's important to remember what data we're talking about here. We had submitted all of the actual information that bears on Commerce's review. These were backup files. These were PDF versions. Excuse me. These were Excel versions of PDFs that had already been submitted. It was just submitting the same data in a different form. So I think we thought at the time, okay, you know, you've got everything you need, Commerce, to conduct your review. And even if you were going to ding us and say, anything that came in late we're not going to look at, they still would have had all the facts and that they needed to do it. Now, again, obviously if we could go back and, you know, do things over again, would we have called... Knowing what we know now, would we have called Commerce and said, look, we had a problem with access and would we have called Commerce before? Of course we would. This was part of our remedial efforts to take advantage of Commerce's first time grace policy, which is what they require. They said, you know, if you want the grace policy, you need to show. How are you going to prevent this from happening again? We have better training on that issue specifically, both calling before and after. But I would submit that if you look at the full record of what we did here, you do not see a company that is intentionally obfuscating Commerce's proceeding, that's trying to frustrate it. We look nothing like Dong Tai Peek, where they knew about the problem 10 days in advance. This is a company that was diligently trying to comply with this investigation, that encountered an unexpected calling. I'm just not, I'm not, I'm not buying that part. I mean, you know, you, as lawyers often do, wait until the very last minute to submit your filing and it was user error. There was no problem with access. Access wasn't down. Access didn't, you know, go down. You, you didn't properly do it. You waited until the last minute. You didn't properly do it. But that isn't, to me, the problem because mistakes happen and this is not a jurisdictional mistake. You didn't miss a statutory notice of appeal deadline. That's correct. But then you hid it. You like, you, you buried your head in the sand. That's the part I don't understand. May I, may I make two responses to that, Your Honor? The first is I respectfully, but I have to point out that, you know, the premise of Your Honor's question was that there was no problem with access. Respectfully, it's just not quite right. It's important to remember, we used the access check file feature. We were submitting these documents to get them to pre-clear with the system to find out, are we going to have any technical problems? The system came back and said no. In the face of having run that check, I think it was reasonable to start the filing almost an hour before the deadline. It was the unexpected, you know, system's rejection of our filings when we first tried to upload them, especially in light of having pre-cleared them, that led us to run up to this deadline. I think that's the first thing. The second point is just respectfully, this was not about trying to hope that we didn't get caught. We couldn't have imagined that Commerce's response to this very, you know, to a 16-minute delay to have backup files would be to impose a draconian punishment. That's not a, that is not, the fact that we didn't know how bad the penalty could be is not an answer. It does not prove that you tried to hide the ball on what you did wrong. That proves that had I known how bad the penalty would be, I would have come clean. It does not at all, from a logical standpoint, prove the concern I had, which is you're an officer of this court, you're an officer appearing before an agency, you know, you've got an obligation to be on the up and up at all times and not try to slide something by hoping it doesn't get noticed. I completely understand that point, Your Honor, and I think the full record of Oman Fastener's participation in this proceeding reflects a diligent desire to participate, to be faithful, to carry out those duties, to provide Commerce with everything it needs. We didn't have a motive to try to hide something here. No, you screwed up and didn't own it. And that, you need to walk out of this room and you need to own, and you need to not do it again. I completely understand. I'm mommying you now if you're not getting it. I completely understand that, Your Honor. We understand that a mistake was made. We've put in place remedial measures to make sure that it never happens again. And it will happen again, because people are human, and you hope it doesn't happen in a jurisdictional situation, and when it does, I expect you and your firm to own it and ask for forgiveness, not try to hide it. That's obviously what will happen in any future instance where this occurs, Your Honor. Can I just ask you a very dull and almost certainly irrelevant factual point? Dad stepped in to save you from mommy. Was there action after the 5 o'clock time on your part, or was it you had done everything, you had pushed all the buttons and it just took until 5.16 to get the confirmation that you needed for the process to come to its completion? Your Honor, in truth, I don't think so. The wording was a little bit unclear to me. In truth, I don't think I know the answer to that question with certainty. I know. You learned. I'm, Your Honor, I am absolutely content to be perfectly open and honest with this Court about what I know and what I don't, and what we did and what we didn't do. We're not here trying to say that we did everything perfect. Mistake was made, clearly. We understand that. We accept that. Well, I think what we're – I don't know the specific answer to whether we hit the sandbox at the wrong time. That's not a good phrasing. A mistake was made. We made a mistake. That's much better. We made a mistake. We made a mistake. There's no doubt about that. We made a mistake. The question is, I think, what is an appropriate response? What was a reasonable exercise of discretion? I think we got it. Thank you, Your Honor. Thank you so much. Mr. Gordon. Excuse the Court. I'll be brief. I understand that I'm over time. A couple of cleanup points. Contrary to what Mr. Houston said, the files that were filed late were not simply optional backup files. The last file that was filed, the latest of the filings, was their revised U.S. sales database, which actually is one of the two pieces that go to the heart of Commerce's dumping analysis. It contains all the data on the U.S. sales, which is the core of the dumping analysis. This Section C supplemental questionnaire response had multiple, multiple questions with multiple subparts reflecting a huge variety of flaws and deficiencies in their early reporting. The claim that... I just want to be understood. I think I'm a little confused. I guess I thought what I was hearing was that Excel versions had already been submitted of all of the documents at issue. What was being submitted at this 5 o'clock time were PDF versions, but the information, including the up-to-date, was already submitted properly to  Is that wrong? That is wrong.  Among the things that were filed, as I said, was their revised U.S. sales database. That is the heart of the dumping data that Commerce has to use, so it is not correct to claim this is merely optional. The initial questionnaire... Put aside optionality. Yeah. I'm just trying to understand whether the information, the up-to-date information, had already been put into Commerce's hands and what was being submitted now was a particular format of information. Absolutely required, but nevertheless just a different format.  No. No, Your Honor. Because the database that goes in is in a format with SAS programming, and it's not something you can submit, for example, in a printed form and then use. It's only in that SAS format that's then brought into the computer program. This is the company, SAS? SAS. Yes, Your Honor. Okay. Got it. Yeah. The other point I would actually want to make here is that, with respect to Commerce's, the preambulatory language about giving an automatic extension until 8-3 the next day if you get a timely extension request in, and Commerce doesn't have an opportunity to respond. Firstly, that has to do with timely extension requests, not untimely requests, which are subject to the requirement of showing an extraordinary circumstance. And the other part is, it was not buried. It was published in the Federal Register in 2013. And as we cited in our reply brief, there's very good, very obvious, well- known case law that says that puts everyone on notice. In fact, what I'm hearing opposing counsels say is, we didn't know about it. Whose fault is that? They need to be aware of Commerce's practices and things published in the Federal Register. This is consistent with the entire issue here of them now trying to blame the Commerce Department for problems that are entirely of their own  And, as Judge Moore, you discussed, the fact that they chose to hide this. So Commerce was entirely well within its authority to take the adverse measures it took. Let me also add one point about the rate. Commerce was within its authority to do something. There's no doubt. But the 154% is like, you know, my kid was 15 minutes late for curfew and so I chopped his leg off. I mean, that doesn't feel like the appropriate motherly response. Not that Commerce has to be a mother in this situation. But, I mean, 154% when they were zero or 1% or whatever. That's a wow factor. But Commerce didn't have any real options there. Because the record showed rates of, the original investigation rate was around 9%, which was then revised to around 4%. Then they had rates of zeroes or 1.65. Commerce had to, chose to assign a rate that was sufficiently adverse to induce future cooperation. On this record, that 154% rate. No, you can't say to induce future cooperation because they cooperated. They were just 15 minutes late. And they tried to do it an hour in advance. I mean, they screwed up, no doubt about it. But they did try and they did cooperate. They just didn't cooperate timely. So you can't say it was necessary. This isn't one of those parties that was trying to hide their data, which we see, which is why Commerce ends up pivoting and going to adverse inferences a lot. This is a company that fully attempted to disclose everything. They just got on the ball too late and didn't do it the exactly right way. And then I think an important part of it is the next piece, which is, as you asked, why did they try to hide it for five weeks? For Commerce to suddenly realize, oh, this was late filed. No one engaged in self-help to come to us and say, ah, we screwed up. Can you, under your regulations, extend the deadline or allow us an opportunity to submit it? Now that 154% margin, it's important to know, does reasonably reflect Oman Fastener's own experience. Why? Because when it was corroborated, it was corroborated in the first administrative review to use as an adverse rate. It was corroborated by specific reference to Oman Fastener's own sales experience. Now, if you look at the issues and decision memorandum from that, where that was discussed, it's apparent that that wasn't necessarily the highest rate within their database. Because as you know, the dumping database includes margins for individual transactions. Some can be quite low, even negative, for example. Some can be quite high. Commerce found that the 154% rate was reasonably reflective of Oman Fastener's pricing behavior in that first review. Judge Toronto asked opposing counsel one question. I know we're out of time, but I would like to ask. Have you answered the same thing? Which is, if we were in this case to ultimately affirm the injunction, does that resolve the now state appeal? I would say it depends on the basis of affirmance, because the state appeal is concerned with the trial court's decision on the merits, and that's just one portion of the injunction. And we would like to, we would hopefully be able to continue to litigate that, because we do believe that decision is deeply flawed. So you have arguments against the final decision, the CIT's affirmance of the April, whatever year, 2023, right? Remand decision, that are in addition to your argument that it really should have been 154 originally, and it was incorrect to have upset that. Well, the arguments would be largely the same, I think. But as I said, it depends on the basis of, if the court were to affirm, it would depend on the basis for the affirmance and what it says about the merits. Okay. I thank all counsel. This case is taken under submission.